Judge XIsdeewood,
delivered the opinion o'f the court.
This is an action of ejectment instituted by Fowler’s lessee against the appellants. Verdict and judgment for the plaintiff. Motion for a new trial overruled. Various exceptions taken and the cause brought up for revision. The questions made in the court below are numerous and the errors assigned present all of them which were decided against the appellants. They will be disposed of with the more clearness by tracing the titles of the parties litigant from their origin. The foundation of the claim of Fowler is a patent for fifteen thousand acres to John Tibbs and Thomas Young as tenants in dated *146 in December, 1785. The patent describes the land as lying “near the heads of the west fork of Bankliok creek.” Fowler claimed an interest to the extent of two thousand five hundred acres in the tract aforesaid* by the following deeds.
■1st. A deed from William-Reddick, bearing date the 21st of April, 1802, in which Reddick as late sher* iff bf the county of Campbell, purports to convey two thousand five hundred acres of land to Fowler and which, according to the boundary mentioned in the .deed was laid off on the east end of the tract of fifteen thousand acres.
The grounds on which Reddiok undertook toibuko this deed as. sheriff are, that the auditor, in 1798, .transmitted to him- a list of lands owned by delinquents, in which there was-a tract mentioned of five thousand acres as the property of Willoughby Tibbs, situated in the then .county of Campbell, on Bank Lick, upon •which tract there were 'taxes due, and in arrears for 1792, S, 4 anil 5, amounting’to £8 5s. 5d. in order, -that lie, as sheriff, might make-out of the sale thereof, the sums-due as aforesaid, that in pursuance of law he .advertised said land for sale, and on the lUth of Oct. 1798,sold two thousand five hundred acres of said five thousand to Foivler “to be.laid off at-the-upper end of the five thousand acre tract,” no.one offering to pay the taxes due for less land, that the two thousand five hundred acres so sold, had been surveyed according to law and bounded, and that the said £8 5s. 5d. had been paid, wherefore, he .conveys, &c.
'2d. A deed from Thomas Young to Humphrey Marshall, dated the 10th of January, 1814, by which oung conveys all his interest in the tract of fifteen thousand acres, whether divided or undivided.
3d. A deed from Humphrey Marshall to John J. Marshall, dated the 25th .of January, 1815, in which said Humphrey recites, that he acquiesced in a division of the tract of fifteen thousand acres which had been made, whereby' the southern half became the /separate property of his vendor, Young; that he had conveyed to Thomas A. Marshall before his purchase from Young, so much of a tract of thirty-five thousand five hundred and seventy acres derived from Fish-back and Morgan, as lay within the survey of ten *147 thousand acres, in the name of Isaac Milcher and-that there was an interference between the part of the thirty-live thousand five hundred and seventy acres so conveyed to Thomas A. Marshall, and the land which said Humphrey had obtained from said YoungC After making these recitals, the deed conveys to John J. Marshall all that part of said Humphrey’s half of tire fifteen thousand acres not embraced by the conveyance to Thomas A. Marshall-:
4th. A deed from-. John J. Marshall to Jacob Fowler, the lessor of the pláintiffj dated 'the- 17th of February, 1824, which only conveys such interest as John J. Marshalbhas under-, the.claim, of Young, to the two thousand five hundred acres included, in Reddick’s deed.. There is also a deed presented..in the record-from Humphrey Marshall to Joan J. Marshall, bearing date the 5th of August, 1812, by which said Humphrey conveys to said John “all the land to which the said Humphrey hath any title in law or equity by deed-- and not heretofore sold by contract in writing, lying m Boone and Campbell counties, amounting to-twelve, thousand acres.”
A reference is mfikle fir the title papers for a more particular description of. the lands conveyed; but' where the title papers were to be found, and-in whose' names they originally stood, is not said. This deed-', cannot operate upon the controversy for any thing which appears in the record. There is nothing to - show that H. Marshall had any interest in the land-' which Young conveyed to.him in 1814, at the time-this deed was executed. Fowler’s attempt to connect himself with the patent to T.ibbs and Young, through, the Marshalls, is therefore not aided .by, H-MarshalFs deed'to J. J. Marshall executed in 1812, and the validity of his title depends entirely upon the other deeds., noticed. As the plaintiff in- ejectment must succeed^ upon the strength of his own title we,sh«ll proceed to. enquire how far Fowie/ has succeeded in showing that he has title, before noticing the grounds of defence relied- on by the appellants.
We think it perfectly clear that Fowler has no title to any part of Young's moiety of the fifteen thousand, acres, which can operate ugpa the land in controversy in the present aspect of' the cause. The land claimed by the appellants, is the tract of ten thousand acres sur-
iteed to a lis pendens purchaser, is subject to be avoided l),v the result oí' the pendant suit.
To establi.h lieirship, the facts should be proved.
Witnesses should not be permitted to depose who is heir or who is reputed-'to- b'e-heir.
*148 veyed in the name of Isaac Mileher. The patent under which they endeavored to protect themselves, was founded on this survey. Now, 1L Marshall conveyed a part of the land lying within this survey to Thomas A. Marshall, to-wit: the part covered by the claim of Fish hack and Morgan, and this land is expressly excepted in the conveyance made by him to J. J. Marshall. The deed to Thomas.A. Marshall is not exhibited? nor is there any thing to show that the land thus excepted, is not the identical land covered by Reddick’s deed to Fowler, south of the division line .between Tibbs and Young, recognized by Marshall.
If it be the same land, thén II. Marshall never conveyed it to J. J. Marshall as is shown by the terms of his deed. Whether it be the same or not, it was the duty of the lessor of the plaintiff to show and as he has not done so, it cannot be said that he has made out any title to .the land in controversy under Young through the Marshalls.
But if it were conceded that the deed from II. Marshall to J. J. Marshall covered the land in controversy still Fowler’s title, so far as it depended upon that deed would be unavailing; because the suit in chancery asserting the superior equity derived from Milcher’s entry was instituted against II. Marshall and he had answered the- bill before bis deed to J. J. Marshall was executed. A final ¿lecree was obtained against U. Marshall, and he, in pursuance thereof, relinquished all his interest in the interference to a part of the appellants, before the trial in this case.
‘J. J. Marshall was, therefore, a Us pendens purchaser and as such, his deed was void or at least subject to be avoided by the result of the chancery suit; see II Maddox, Chancery, 189, and the authorities referred
, Whether the lessor of the plaintiff exhibited Any title derived from John Tibbs the co-pafentce with Young, is the next subject for enquiry in the investigation of his title. The only direct and positive proof of the death of John Tibbs was excluded by the court. There was evidence that Willoughby Tibbs, was the brother of John and was reputed to be his heir. The evidence conduced to show, that John Tibbs had no sister and *149 ho brother except Willoughby, but nothing is said about John dying childless. The facts should he proved from which ibe court and jury, under the law, might be able to declare who was the heir. Witnesses ought not to be permitted to depose who the heir is or who he is reputed to be; for in so doing, they undertake to decide the law. The evidence of Willoughby Tibbs’ heirship, is therefore of a questionable character. But suppose the fact well established; docs if thence follow, that Fowler has shown a legal derivation of title from him to the particular two thousand five-' hundred acres, described in Reddick’s deed? The sale made by Reddick, took place in 1798.
There is no evidence (for the excluded deposition cannot be regarded) which shows that an interest in the fifteen thousand acres had been before that time cast by discent' upon Willoughby Tibbs, on his brother John’s death. If Willoughby Tibbs owned no part of the land granted to' John Tibbs and Young at the date of the sheriff’s sale, it is plain, that a sale of a part of that land, for taxes, as the property of Willoughby Tibbs, could pass no title to the purchaser. Conceding that the evidence was sufficient to prove the heir-ship of Willoughby Tibbs, still, it is fatally defective in not showing that the title had been cast upon him by discent, before the sale by the sheriff. But suppose it granted, that Willoughby Tibbs was the owner of bis brother’s interest in the fifteen thousand acres before the sale made by the sheriff, for the taxes, there is still another question of importance to be disposed of. .Does it appear that it was Willoughby Tibbs’ interest or any part thereof, in the fifteen thousand acres which were exposed to sale by Reddick and purchased by Fowler? It appears from the transcript furnished by the auditor, that in 1798, he placed in Reddick’s hands a list of lands returned by the sheriffs of the several counties, as lying in Campbell, on which taxes had not been paid for the years, 1792,3, 4 and 5. In this list, there were three tracts in the name of Willoughby Tibbs, one of two thousand five hundred acres, lying on the waters of Eagle Creek, and two tracts lying on the waters of Bank Lick, one of five hundred, the other of five thousand acres. It seems from the return made to the auditor’s office, that two thousand five hundred acres of the tract of five thousand wore sold *150 to Jacob Fowler on'the 9th‘or 10th of October, 179S» <v;an the land which was thus sold as a part of a tract 0p gve thousand acres, lying on Bank Lick, listed in the the name of. Willoughby Tibbs, be a part of John Tibbs’ and Thomas Young’s tract of fifteen thousand acres, lying altogether on the watcrs of Big Bone Lick creek and not at all on the-watefs of Bank Lick? (For such is the.testimony of Scott, the surveyor.) Supposing John Tibbs to have died before-the land was listed, for taxation, and that Willoughby Tibbs,as heir at law, became entitled to said- John’s- interest in the fifteen thousand'acres, and that said Willoughby bad-reduced his moiety, by sale, -to five thousand acres-, and'that in listing the land, he was influenced by- the mistake of the patent in calling for Bank-. Lick, instead of Big Bone, not having learnt the true situation of the land-,, it is very probable,-if not altogether certain, under these circumstances, that he intended,to list.for taxation, his interest in the fifteen thousand- acre tract. But several of these suppositions, vve have seen, cannot be indulged for want of proof, and if they could, as it is perfectly manifest that the land claimed by Fowler under his deed-from Reddick, lies on a different water course from that on which the-land sold’was situated, according to the auditor’s transeript, under which Reddick made the sale, we are of opinion that the sale by Red-dick and the authority furnished him by the auditor for making it, must be confined to land on Bank Lick,. and that the sheriff could not, under such authority,, convey lands elsewhere, consequently, the deed from ■ Reddick to Fowler, embracing lands on Big Bone, passed no title.
Yhe first act for the establishment of a permanent revenue, passed after the organization of the state government, (I Littell’s Laws, 71,) required all persons to-list their lands for taxation, with the commissioners off the district in which such land is situated. If this was 'not done and the taxes paid on or before the 4th February, 1795, the lands were forfeited. By an act off December, 1793, (I Littell’s Laws, 213,) non-residents were allowed to list their lands with any commissioner, of the tax within the state, and to pay their taxes to the treasurer. Citizens were, likewise, authorized to list' all their lands with the commissioner of the district irt which they lived, specifying the quantity of acres and *151 the county in which it lay. By an hct of December, 1794, (I Littell’s Laws, 265,) so much of the act for establishing a permanent revenue, as subjected lands to forfeiture, in case they were not listed with a commissioner, and the taxes paid, on or before the 4th February, 1795, was repealed. By the second section of this act, every person, when applied to by a commissioner, in the year 1795, was required to give a list, -son oath, of all his lands, “specifying the number of acres in each tract, and the county and water course on which it is sitdate.” On failure, their lands were forfeited to the state. By the third section, non-residents were required to enter their lands with a commissioner, in'the manner above directed, .(that is, by specifying the number of acres, county, and water course,) on or before the last day of November, 1795, and on their failure, the lands were forfeited. This is the first act which required the water course, on -which the land was .situated, to be mentioned. It is also the first act which provides for the sale of the land, or so .much thereof as will be sufficient to raise the amount of taxes chargeable thereon.- In making sales, each tract was to be made liable for the taxes chargeable upon it. The sheriff was required to advertise the sale, on the door of the court house, one month, and in this Kentucky Gazette for three weeks; and on making sale, he was directed to give the purchaser a certificate of the quantity sold, describing therein the tract that was charged, with the tax, and the end or side from which the quantity sold is taken. The surveyor of the county was required to lay off the land in conformity to the certificate. Upon producing the survey, so made, to the sherifl, he was directed to convey, and his conveyance, by the act, vests in the purchaser all the right, title,- and interest of the proprietor. By an act of December, 1795, non-residents were required, thereafter, to list their lands with the auditor, (1 Littell’s Laws, 321.) If; the taxes due by them were not paid, the auditor was required to transmit the amount to the sheriff of the county in which the lands chargeable might lie, when the sheriff was required to sell the same, in the same manner, and under the like regulations as resident’s lands, on which taxes might be due and in arrear. This act is the first which prescribes, that in listing lands for taxation, the person in whose name it was entered, surveyed and patented shall be given. Undo: *152 the foregoing acts of assembly, Fowler must have derived his title to an interest in the tract of fifteen thousand acres, under his purchase for the taxes, if he has -any.
In sales of land for taxes, under our State authorities, the rule is, that the acts of the officer will be presumed correct until the contrary appears.
If the list of lands delivericd by the auditor to the sheriff to be •sold for taxes, decribo the land as lying -on one watercourse and the sheriff sells the land as lying on that stream, 'but conveys to the purchaser land lying on another water-course, his deed passes no title.
'In sales of lands for taxes, under our state authority, tBe rule is, that the acts of the officer shall be presumed; correct, until the contrary appeal’s; see Terry vs. Blight, &c., III Monroe, 271; Graves vs. Hayden, II Litt. 65. A different rule has been adopted by the supreme court, in relation to sales made for taxes, under the laws of the United States. The design of the law, in requiring the owner of land to state the water course on which it was situated, in his list of taxable-property, was two fold. 1st. To identify the tract, and to enable the sheriff, in his advertisement, to describe it accurately, if it became necessary to sell it. And 2d. To enable those who might he disposed to purchase, to find it by the description, to ascertain its value, and to regulate their bids accordingly. Now, presuming all the acts of the sheriff to have been in strict comformity to law, he then advertised for sale a tract of five thousand acres on Bank Lick; he sold a part of the tract as.situated on Bank Lick, and gave his certificate accordingly. When the surveyor, thereafter surveyed on Big Bone, and the sheriff-conveyed the land thus surveyed, they departed from the law, as is shown by the evidence, and so far their acts conferred no title. There is no evading this conclusion, unless we proceed upon the ground, that a mistake was committed in listing the land for taxation, by describing it as lying on Bank Lick, and that proof of such mistake should be received in. support of the title. In the case of Hood vs. Mathers, II Marshall, 556, it was said that .a variance in quantity might be cured by other evidence establishing the identity-of the land sold, hut we know of no case which forms a precedent for getting over a variance in the water course, and we are not disposed to make one. Bidders and purchasers have no right to complain, when they purchase land on one stream, that they must find it there or not get it at all. We arc not disposed to help them out in their speculations, although we will give them full justice by presuming that all was right until tbe contrary appears. In the case of Hood vs. Mathers, the court noticed that part of the -evidence, particularly, which *153 stated that the land in contest lay on the same water course with that mentioned in the auditor’s list furnished the sheriff» If, in the present case, the sheriiF had advertised the land-for. sale, as being land lying on Big Bone Lick 'creek, persons might, for any thing known to us, have attended the sale, who -Would have paid the taxes for half the quantity claimed by Fowler. It was the sheriff's duty to advertise, however, in pursuance of the auditor’s transcript, and to sell-accordingly. The-error consists in goingto a different quarter of the country, afterwards, -to hunt thedanek It is >not necessary that we should now determine whether the land granted to Tibbs and Young has been subjected to forfeiture,'regarding it as never having been -listed for taxation, under the evidence béforfe us.
But there is still another view of the present controversy, growing out of the nature of the lessor’s title, which -will show thatthe court erred in refusing to-grant 'a new trial. If it be conceded, that his purchase for the taxes, conferred a valid title to two -thousand five hundred acres in the fifteen thousand acre tract, it cannot he pretended that -such purchase could interfere with the rights of Young, the tenant in common, or with the rights of others who were then interested in the tract. If, at that time, no division of the tract in severalty had been made, Fowler’s purchase could only entitle him to so much out of Tibbs’ share, after a division was made; or, to place him in the most favorable attitude, it could only make him tenant in common, to the extent of two thousand five hundred acres. In 1811, a division of the land, (whether legal or illegal need not be decided,) was effected by commissioners appointed by ,the county court* If this division be binding, then Tibbs’ part of the land, and consequently-, Fowler’s claiming under Tibbs, does not, according to the proof, interfere with the lands occupied by t[ie defendant in the circuit court. If this division is illegal, then Fowler cannot claim to he any thing more than a tenant in common, and had no right to appropriate to himself, the particular two thousand five hundred ■acres, covered by Reddick’s deed. Under every view of the case, in relation to the lessor’s title, the court erred in refusing a new trial.
We are relieved, by this conclusion, from a particular examination of the various other points presented» *154 Most of iliem may never occur again. We deem it useless to inquire how far seme of the defendants may have been estopped to deny the title of the lessor of the That matter may, on another trial, assume a different aspect, and therefore, we shall do no more than to award a new trial, to be conducted upon principles not inconsistent with this opinion. The deed of the lessor of the plaínüff, from Reddick, was heretofore a subject of consideration with this court, but the .matter now presented, in regard to it, was not then relied on; see the case of Curry, &c. vs Fowler, III Marshall, 504.
Wicldiffe and Woolley and Chinn, for appellants: Criienden, T. Crittenden and Richardson, for appellee.
Judgment reversed, and cause remanded for a new trial. The appellants must recover their costs.